May it please the Court, Alan Graff for Appellant Linda Viles. If I can, I'd like to reserve one minute for rebuttal. I'm going to try to address five issues. Failure to take medication, cause of exacerbation of mental symptoms, the testimony of Dr. Davis being consistent with Dr. Truhn, psychiatrist Carolyn Hartman's marked limitation in the ability to accept instructions, respond appropriately to criticism not adequately projected by the ALJ, and the opinion of Carolyn Hartman, Dr. Davis, and Dr. Lehman all limiting concentration, persistence and pace not being incorporated by the ALJ in his RFC and not harmless error. I'll start with failure to take medication. The consistent and pervading theme I think through the vast majority of cases on point is the failure to take medication. Is it volitional? Is it by choice? The ---- So more fundamentally, did the ALJ rest his decision on the failure to take medication? I think it was ñ there were two points. One, it was failure to take medication. And one, that the main cause of her exacerbations were ñ the main cause of her hospitalization were that she didn't take her medication. It was that her medication wasn't properly regulated. And he said she didn't have problems when the medication was properly regulated. But in the record of his decision, he did not base his determination of lack of disability on her failure to take medication. I would respectfully disagree with that. Okay. Point me to the record where he said that the failure to take medication resulted in a finding of no disability. Judge Rawlinson, are you asking about the ALJ or the district court? I'm asking about the ALJ. ALJ, okay. I think that was the argument that counsel just made, that the ALJ noted that there was a failure to take medication. So I'm asking you if that was the basis for the finding of a lack of disability. Well, it was ñ I think it was twofold. One, it was her failure to take medication. Also, he was saying that ñ Just show me in the record the language you're relying on. Okay. In the disability determination. Excerpts of record 41. Overall, it's almost the last paragraph. Overall, the claimant's allegations are generally credible within the parameters of the residual functional capacity determinants decision. Record shows that she does okay when she remains on medication. Right. And so that's the ALJ saying that as long as she's on medication, she's okay. When she goes off medication, she's not okay. Well, but the bottom line decision on page 43, he said the determination was made on the residual functional capacity. Where he actually made the finding of not disabled on ER 43. Right. Didn't say anything about medication there. Well, but it's ñ he says that the reason that he finds that she's able to do these and do all these jobs and that the RFC that he found, which was not an RFC that would be reflective of her fragility, of her condition, which was supported by eight different providers in various ways. He found that she could work in a quiet environment without any public content, public contact with no exposure, only infrequent interaction with coworkers. He ñ that was the way he incorporated the findings and opinions of eight different providers. But that wasn't correct. She was a lot more fragile than that. Her ability to sustain work full time based upon the fragility of her condition. It just wasn't there. And so, you know, within the body of his decision, he mentions the medication. And actually, that's part of his credibility determination too, that he finds that's his main credibility determination, that she's not credible because when she didn't take medication, she fell apart. But I think the distinction is that the medication was the last step in a chain of exacerbations. If you look at the medical record, particularly the hospitalization of 2000 and 2003, you can see that there's a lot ñ there's a few incidences where she starts falling apart, and at the very end, she stops taking her medication. That's not a volitional act. That's because she's mentally ill at that point. She's using bad judgment. That's a mental symptom. That's the distinction from the war case. And the war case that the district court cites is based upon Brown v. Barnhart, an Ace Circuit case. And in that case, the doctor, the ALJ, found that because the claimant didn't take a hypertension medication, she couldn't claim disability. That's a volitional choice. That's a physical choice. For instance, if I was prescribed antibiotics and I didn't take them and I developed a disabling infection, I continue to not follow my doctor's advice, then under war and under disability law, I shouldn't be found disabled. But if I'm mentally ill and I'm not making the right choices because of my mental symptoms. So where in the record do you ñ is there substantial evidence that her mental illness caused her not to take the lithium? Because it seemed to me this case was distinguishable from some of the other cases you cited because in another case the person couldn't afford the medicine. And here we have a woman who went, sought treatment, you know, that seems rational, and was given treatment and then just didn't take it. And it doesn't seem to be ñ what's the reason for not taking this medicine? I don't see a reason that, you know, is similar. Well, you look at the exacerbations before the two hospitalizations, and I cite them like, for instance, the 2000 compensation, a month before claimant's husband's reporting claimant hasn't slept for three nights, starting to exhibit some of the past symptomatology. 326, claimant ER-411, claimant's not slept for a couple of hours the past night, it's an increase in symptomatology. Then claimant's admitted to the hospital with low lithium levels on 5-28-7-0-0. Then you have a number of the providers talk about how that ñ Well, ER-204, Dr. Alan Cohn says manic prior to hospitalization, even on lithium. Lisa Smith, ER-227, one month before decompensation, stress of mood combined with concern about her husband's health problems contributed to another manic episode despite taking medications. So there she was taking medication. She was taking medications up to maybe a day or two before she had the hospitalizations, both times. What was happening was her symptoms became more and more severe, and to the point where she started losing her ability to make correct judgments, and then she stopped taking medications. So she's being penalized for bad judgment from her mental symptoms. Dr. Troon reviewed the entire record, and by the way, one of the reasons that the appeals council found that Dr. Troon's opinion should be given limited weight was because it was a retrospective opinion. That reason could also be applied to Dr. Davis's as well. Both Dr. Davis's opinion by testifying at the hearing was two years after the date last insured Dr. Troon's was three years. Both actually agreed. If you look at, in some ways, Dr. Davis and Dr. Troon, both actually found that she was fragile, and under C1 of the listings that C1 criteria, even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Dr. Davis testified twice at the hearing that she had her illness. It was at the severity of a listing. But he couldn't translate it under the B criteria. What he actually was saying, it was under C1. He never really actually said that, but he alluded to that. Dr. Troon later confirmed Dr. Davis's opinion. And it's interesting, the AC, the appeals council, when they reviewed Dr. Davis's testimony said, well, he didn't really say that. But he did. He said it twice at ER 455 and 459. I do think she's of the severity that would meet the listings. He never discussed the C criteria, which he should have. That's the whole theme of this, that she does okay at home. But, you know, with added stresses, she starts falling apart. If you put her in a work environment, she would fall apart. You have pretty much eight providers saying basically the same thing. She's too fragile to stick her in a 9-to-5, 8-hour-a-day, 5-day-a-week, 4.3-weeks-per-month environment, which we'd have to produce every day. That was said by Lisa Smith. It was said by Cynthia Macklin. It was said by Dr. Theresa House, Joyce Bonner, Dr. Troon, and even, to some degree, Dr. Davis. So there is evidence, substantial evidence, to support that conclusion. I wanted to address Dr. Hartman's finding that she had a marked limitation and ability to accept instructions and respond appropriately to criticism from supervisors. And I noticed my time's up here, so if you'd allow me to do that, or I'll let it sit down, too. Go ahead. Finish your point. All right. He found that there was ñ Carolyn Hartman is a psychiatrist. She treated Linda Viles at the Johnson Unit and also later on Evaluator. She found that she had a marked limitation and ability to accept instructions and respond appropriately to criticism from supervisors. The ALJ wrote there is nothing in the examination to support that conclusion and it's not consistent with earlier reports during the relevant time period, citing B7F and B19F in the record. However, as I pointed out in my briefing, Carolyn Hartman noted that the claimant had a history, a childhood history of criticism and brutal spankings when as a child. If you also look at B7F, which is ER 204, the medical record of Dr. Cohn cites the same history of having strict parents who inflicted physical abuse on the claimant. She was frightened of her father from severe beatings, bruises when he was in a rage. And B19F, the same exhibit cited by the ALJ, ER 321, the parents used the belt and yelled a lot. So the reason that the ALJ used to reject this specific finding of Dr. Hartman is not at all supported by the record. The record completely contradicts the ALJ's findings. Thank you. Thank you. Thank you. May it please the Court, Richard Morris on behalf of the Commissioner of Social Security. Your Honors, this is a difficult case. It's clear that Ms. Wiles is a very sympathetic claimant and she has a serious bipolar condition. What is not clear, entirely clear from the record, is that she is unable to sustain work activity. The record in both terms of medical evidence and the lay evidence is not definitive and it's not clear. And I respectfully disagree that there were not eight different providers that stated that she was too fragile to work. The evidence showed that during the period at issue she had two decompensations, 2003 and 2000. The record shows very clearly that between those times and after 2003, she was doing well. There are numerous reports from her own providers and from examiners that say that she's doing well. The global assessment of functioning scores are ranging from 60 to 70, which are mild in terms of symptoms. Dr. Davis, the medical expert who testified, said pretty much when she has these exacerbations, she's not able to function. But those two exacerbations, I think you need to look at the circumstances of those. There were two things present during both of those. In the first one, it was not taking her lithium and she had some serious extreme stress in her life. She was moving, she was relocating her family, and her husband had some illnesses. In the second one, it was again medication mismanagement and she was in the process of providing care for her mother-in-law who had been in an accident. ALJ recognized in this case that there was, in fact, stress that impacted on her. But he said, number one, it was medication plus the extreme stress. And number two, the residual functional capacity takes into account the normal stresses that she has by allowing for a quiet, non-hectic work environment, no contact with the public, that relieved those issues of stress. And what kind of jobs are available in the national economy to an over-50-year-old woman with mental disease who has to be in a quiet environment with no public exposure and infrequent interaction? What kind of jobs fit within that? The three jobs that the vocational expert gave, which were given that criteria, were industrial cleaner. Industrial cleaner. That means it cleans what? The DOT job discussions were attached to plaintiff's brief. One was the electronics worker. The industrial cleaner is more or less like a janitor or a sweeper in office buildings, things like that. And the third job is a motel cleaner. That was described a little more broadly as a housekeeper cleaner. And that job in particular, I think, is appropriate. And keeping in mind when you're at step five of the sequential process, the vocational expert gives these jobs as examples of jobs that exist given the age, education, and residual functional capacity of the claimant in the case. The V.E. was aware of that and gave these jobs. But those, you know, like a hotel maid, those are stressful jobs. Respectfully disagree. The vocational expert found that they were not. Why don't you talk to some of the maids and find out whether their jobs are stressful? I mean, they're given quite an inventory of rooms to take care of. And they work under time constraints with supervisors watching them all the time, people complaining that they've got to find rooms that the occupants want them to come in and clean. Others want them to come back in an hour. It's not an easy job. What else did they have? Industrial janitor. Cleaning at night when nobody's there in the building. The vocational expert was questioned about the stress nature of these jobs, in fact, the possible production levels. And he mentioned, or she mentioned, well, the motel cleaner, for one, she mentioned that that person works independently and does not have the stresses of dealing with the public and such. So the vocational, that's the precise reason we use vocational experts. Was it motel versus hotel? I noticed you said motel. Motel. That was specifically the job. It's a subcategory of the housekeeping cleaner job, but that was the job that the vocational expert was specifically testifying about. It just doesn't seem realistic. They say she can't interact with people and she can't have a job where she interacts with the general public and then they want to put her out there with, you know, working at an industrial site cleaning up or a motel. I mean, you're out there with bunches of people, different people, people you don't know, and you have supervisors and coworkers. I mean, it just doesn't make any sense to me. I mean, I could see if they maybe said, oh, I don't even know what job would fit, but, I mean, you know, researcher maybe, where you wouldn't see anybody, librarian. That could have its own stresses. But I just don't see those jobs as being ones that, especially, I mean, being realistic, a woman who's over 50 with this history of mental disease, does she have a realistic chance of getting hired by anyone? Your Honor, that is not. But that's not the issue. The issue is what jobs you would be able to perform in this economy. Exactly. The issue of whether jobs are available and whether one would be hired at age 50, unfortunately, is not part of the social security. I thought at some point you get to looking at the age grid. The age grids come into play at step five when there are limitations primarily on the physical aspects of the job. For instance, if a person is limited to sedentary only and has minimal education and is over age 55, then you quote grid out where there realistically is no job. In this case, as in many, there are no exertional limitations. So that availability of jobs versus age does not really come into play. I had something like this many, many, many years ago, and this case reminds me of that case. You had a guy that just couldn't work among people and he had a lot of emotional problems. He had to work in a very quiet environment. He preferred to work at night and he had, oh, I think some problem with standing for a long time. It sounded like the wreck of a Hesperus. So we asked this expert who testified, well, what jobs would be available for him in the economy? And his answer was that he could be a night watchman in a mortuary. You don't have to deal with people. It's a night. Quiet. Quiet. So that was it. You yourself have said that this is a very difficult case. It's a close case. Then why shouldn't we err on the side of the benefits here? People with bipolar, that's a very, very tough mental disorder,  and people that are on meds, one of the big problems is getting them to consistently take their medication unless they have a caregiver with them or a spouse who makes sure they take the medications at the right time. So what's happening to her certainly isn't unusual. Two things I would like to address as to why this case should go one way or not the other. The commissioner is tasked under the Social Security Act of determining the regulations and applying the law. In the Ninth Circuit case law, I think the Tomassetti case is probably as good an example as any. The evidence is susceptible to more than one rational interpretation, and it definitely is in this case. And the ALJ, as the trier of the fact, gets to make that call. And the call was that she was able to, when properly medicated, given the residual functional capacity, she could do that. And when that evidence does support either interpretation of the evidence, when the record supports either interpretation of that evidence, then the court should uphold the ALJ's decision. Well, but let me ask you this. There were medical opinions in the record of three treating physicians that supported her claim, as I recall, that she experienced symptoms even when she was on medication. Isn't that correct? That is correct, although I'm not sure those were all treating physicians. A number of the providers here, Dr. Hartman, Dr. Truman, were examining physicians. They weren't directly her treaters. And, again, there's no question that she did have symptoms, but with medication and with the proper, less stressful type of work, the ALJ determined that she was able to do that. And I do want to point out that at one point in the testimony, and that's at ER 452, Ms. Biles herself acknowledged that she can foresee the increase in symptoms coming on and she can avert the attacks, so to speak, by dealing with them through medication. So I think there was some recognition to that. Your Honors, my time is well up, but there is one issue that was raised in Appellant's reply brief. Well, I mean, there was evidence that people who were afflicted with bipolar disorder are likely to refuse medication because of their illness. There's some evidence of that. I'm sorry, would you repeat that? There was evidence in the record that patients who suffer from bipolar disorder are likely to refuse medication because of their illness. That's a big problem, isn't it? I'm not sure that's in the record. I know counsel has argued that, but I don't believe it's clear in the record that that was the cause in this case. As a general rule, that may be true, but I don't think the evidence supports that in this particular case. Why would you want to address an issue that's in the reply brief? Because Ms. Biles has raised that issue for the first time in a reply brief, and it was ‑‑ Usually we don't consider issues that are raised for the first time in a reply brief. Why would you raise it? Well, that was part of my point, is to point out that it was raised for the first time and it should not be considered. Are there any further questions, Your Honors? Well, okay. So the point that it makes is in the reply brief, it was raised for the first time. I think the point was made in the blue brief. They just elaborated, but it kind of goes to the point that I made to you, which is, in fact, the jobs that are listed do require interaction with the ‑‑ the definitions do require interactions with the public and taking instructions and all of these things that were part of the hypothetical that they weren't supposed to require. And I think it's a valid point, and it's just elaborated on more here when the definitions were given. Well, that issue, the commissioner's argument on the fact that unskilled work accommodates the need for simple instructions and tasks, which is what the state agency doctor had found. That issue was argued by the commissioner in place before the district court. Ms. Viles did not contest that argument, and it's not even addressed in the district court brief. And my point in bringing it up was it's only in this reply brief that that's come up for the first time. Is there anything further, Your Honors? Now, was she eligible to reapply? Should her circumstances change? No circumstances. She ‑‑ this was Title II social security disability only, and she was insured for coverage only through March 31, 2004. ALJ decision came after that, so absent some basis for reopening the prior decision, her condition after 2004, even if it increased in severity, she couldn't file a new application. She couldn't file a new application. She could not. The SSI program is a possibility, but as you know, there are income and resource rules dealing with that. The SSI. Supplemental security income. Yeah, I know that. Ms. Viles is also approaching retirement age, and she will, I think, sometime soon be eligible for social security retirement, but not the disability insured status for now, 2004. How old is she now? She was born in 1949, which would make her, I believe, 61 now. The retirement age is what now, 62? Retirement age is actually a moving target under the most recent legislation. It's between 62 and 64. As dates of birth increase, it's incrementally going up, so it's probably 62 and a half or so, I would say, for Ms. Viles. So what's the total amount of her claim here, if you had to add it all up? The total amount of benefits payable? Yeah. I'm sorry, Your Honor, I don't know the answer to that. I'm not sure it was ever computed since she was never formally approved for benefits. But it would go back how many years? In terms of computing her benefit? Yeah. Roughly, the computation is fairly complex, where you take the first five highest years and a percentage and then so forth. For how many years would she be eligible? Back to the time, the date of last insurance, right? If she were, if the court found her entitled to benefits based on this claim, which was filed in 2003, she would be entitled to benefits back to December of 2002, one year retroactive from the filing of that claim. Just one year? When you file a claim, you're normally entitled to retroactive benefits for one year, provided the date of disability was at least one year in the past. So from December 2002 would be how the benefits would be calculated? Yes. Was she entitled under this application? Right. And then they would be cut off at what year? 2002 to what? I'm sorry? What would be the end date? If a person is entitled to disability, they continue indefinitely until there is medical recovery or the person reaches full retirement age, in which case it doesn't matter if you're disabled anymore under the Social Security Act. So it moves forward, too? It moves forward. I'm sorry? Well, I mean, she'd get it from this date that you just gave us. Yes. And keep getting it. There would be a retroactive amount to go back that far. And monthly benefits. And monthly benefits continuing until full retirement or a cessation of disability. Until she gets under Social Security. Until she reaches full retirement age, yes, in which case it doesn't matter whether you're disabled or not. I see. In some Social Security cases, as you're probably aware, conditions do improve. Cancer, for example, may go into remission, and a person may be able to work again at that point. I'm not sure that would be applicable in the case of this. Well, let me just tell you this. You've been very helpful. You've done a very skilled presentation. You've been open and frank with the court. You're knowledgeable, and we appreciate your coming here today and your presentation. Thank you very much, Your Honor. Want to say something? Huh? Yeah, you have it. Thank you. Just briefly, I wanted to just address raising another issue because the way it's sort of a I raised the issue of whether claimant could, with a limitation of limits and concentration, be able to perform two of the jobs in my reply brief because an appellee opened the door. The appellee argued that there were three doctors who said the claimant had limitations in concentration. Dr. Lehman, the DDS doctor, Dr. Hartman, and Dr. Shroon. And that limitation was not incorporated in the RFC, the ALJ's RFC. In appellee's brief, the appellee commissioner argued that that was harmless error. Because the commissioner argued harmless error, I believe that opened the door, and I said it's not harmless error because if there was a limitation in the ability to do, to take, if you limit it to only simple instructions, then two of the jobs, because there were level two reasoning, and don't allow detailed instructions, those jobs would, the claimant couldn't do it. So it's not harmless error. And the third job was the motel, working as a motel. And the description of working as a housekeeper, and the description of a housekeeper says working with patrons. The ALJ's limitation said no contact with the public whatsoever. It didn't say limited contact. And so that job is just eliminated based upon the ALJ's RFC. So that's the reason I brought that up, and I understand I'm not supposed to be. What about someone who goes in at night and cleans an office building? Well, that could be, that's one, who knows how many jobs there are, but. There are a lot of them. People come into our building every night and clean. But the commissioner has the burden of proof at step five. And the commissioner just said this job can be done with that RFC. That's what the vocational expert does. The vocational expert takes the limitations and then opines as to what jobs there are. And if there is, I mean, if that's in the record, how do we say that the vocational expert doesn't know what she's talking about? Because it was a deviation from the Dictionary of Occupational Titles, and I forgot the particular case. Well, you didn't put that in your brief. Yes, it's in the brief. Not the blue one. It's, I believe it's, I'll have to look. But if it's a deviation from the Dictionary of Occupational Titles, and I put it in the reply brief again because the commissioner raised the issue that it's a harmless error, that limitations of concentration weren't included in the RFC. And the description of housekeeping says working with patrons. And so that job is just, it wouldn't work. I want to just address one other issue, which was that the claimant could be doing well at times. Dr. Truon, who is a social security, who works for social security as a psychologist, he does works both privately and for the administration, talked about this examiner's belief that individuals with severe and persistent mental illnesses are able to experience higher levels of functioning for brief periods of time with significant external support. Mrs. Viles' case, she seems to use denial repression and rationalization extremely well at times. But her emotional functioning seems to be extremely fragile, and disruption in her day-to-day life or the addition of external stressors seems to exacerbate depression, anxiety, or mania. There's also four different doctors who said she can't work. Dr. Theresa House, Dr. Carolyn Hartman, Dr. Joyce Bonner, Dr. David Truon, and even Dr. Davis, the administration's own medical expert, said the severity of illness meets the listings. Thank you. All right. Thank you very much. I appreciate the excellent argument on both sides. The next two matters, U.S. v. Hewitt and Norman Lind, the next case, both of those matters are submitted. And with that, we'll recess until 8 a.m. tomorrow morning.
judges: Pregerson, Wardlaw, Rawlinson